## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| EAGLE TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 22-738 |
| | ) | |
| v. | ) | Filed: December 29, 2022 |
| | ) | |
| THE UNITED STATES, | ) | Re-issued: January 13, 2023* |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DYNANET CORPORATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff, Eagle Technologies, Inc. ("Eagle"), filed this post-award bid protest challenging the Department of Interior, Interior Business Center, Acquisition Services Directorate's ("DOI") decision to award a task order to Defendant-Intervenor, Dynanet Corporation ("Dynanet"), under a blanket purchase agreement for information technology support services. Eagle contends that the DOI's award was arbitrary and capricious because (a) the DOI failed to consider Eagle's demonstrated prior experience in conformance with the terms of the solicitation, and (b) the DOI did not evaluate the parties' quotes on an equal basis. Eagle requests that the Court enjoin

---

*The Court issued this opinion under seal on December 29, 2022, and directed the parties to file any proposed redactions by January 9, 2023. The opinion issued today incorporates the proposed redactions filed by Dynanet. Upon review, the Court finds that the material identified warrants protection from public disclosure, as provided in the applicable Protective Order (ECF No. 12). Redacted material is represented by bracketed ellipses "[. . .]."

performance of the task order award and remand to the DOI for further proceedings in accordance with the Court's judgment.

Before the Court are Eagle's Motion for Leave to File an Amended Complaint and the parties' Cross-Motions for Judgment on the Administrative Record.  For the reasons discussed below, the Court **DENIES** Eagle's request to amend the Complaint, **DENIES** Eagle's Motion for Judgment, and **GRANTS** the Government and Dynanet's Cross-Motions.

## I. BACKGROUND

### A.    The Solicitation

This protest relates to a solicitation for information technology support services to be provided to the Department of Health and Human Services, Office of the Inspector General, Office of Information Technology ("HHS/OIG/OIT").  HHS/OIG/OIT provides for the development of new, mission-critical applications as well as the continued operation and maintenance of an existing suite of over 30 applications.  Admin. R. 1, ECF No. 17 (hereinafter "AR").[1]  The Government determined that establishing multiple award Blanket Purchase Agreements ("BPAs") under the General Services Administration ("GSA") Multiple Award Schedule ("MAS") was the best way to satisfy the agency's need for re-occurring development and platform support services. AR 2.  Specifically, through the same solicitation, the DOI anticipated awarding three BPAs and awarding BPA Order 1 to one of the BPA awardees.  AR 1.  BPA Order 1 was a continuation of work performed by incumbent Digital Management, LLC ("DMI") with Eagle as a subcontractor. AR 953.  As part of an interagency agreement, the DOI performed the acquisition services on behalf of HHS/OIG/OIT.  AR 1.

---

[1] For ease of reference, citations to the administrative record refer to the bates-labeled page numbers rather than the ECF page numbers.

On April 12, 2021, the DOI issued Request for Quotations No. 140D0421Q0158 ("RFQ") to 11 small businesses in accordance with Federal Acquisition Regulation ("FAR") 8.4.  AR 5, 23. The DOI amended the RFQ on April 19, 2021, in response to questions submitted as part of a pre-quotation conference and the official RFQ Q&A period.  AR 124.  The RFQ included as attachments the BPA Performance Work Statement ("PWS") and the BPA Order 1 Statement of Work ("SOW").  AR 77–97, 111–23.

Per the solicitation, the DOI would conduct the award process in two phases with BPA Order 1 "competed and evaluated concurrently with the multiple award BPAs."  AR 127.  In the "Quotation Content / Submission Requirements" section (Section 6), the DOI gave an overview of the two-phase submissions.  AR 128.  Quoters would first submit Phase I responses (*i.e.*, Volume I), which had to include, among other things, information about the quoters' demonstrated prior experience (Factor 1).  AR 129.  After evaluating prior experience, the DOI would issue advisory notifications to all quoters indicating the Government's recommendation to proceed or not to proceed to Phase II.  AR 131.  Those quoters that were rated most highly would be advised to submit their Phase II responses (*i.e.*, Volumes II and III) for evaluation in accordance with the RFQ procedures.  *Id.*  Phase II submissions would address technical capability/understanding, management approach, and price (Factors 2–4).  AR 132.  Section 6 of the RFQ noted in a short addendum on page five that "the Government's evaluation of Phase I / Factor 1, the most important factor, will be considered alongside the evaluation of Phase II when the Government makes its source selection decision."  AR 131 ("Phase I / Factor 1 will be more important than Phase II evaluation factors.").

In the "Evaluation" section of the RFQ (Section 7), the DOI listed the evaluation factors in descending order of importance:

| Phase | Evaluation Factor |
|-------|-------------------|
| I | Factor 1: Demonstrated Prior Experience |
| II | Factor 2: Technical Capability and Understanding |
| II | Factor 3: Management Approach |
| II | Factor 4: Price |

AR 135.  Under each of these factors, the RFQ listed several subject matter areas (*i.e.*, subfactors) that specifically defined the evaluation criteria.  AR 135–37.  The DOI anticipated conducting a comparative analysis at each phase.  AR 135  The Contracting Officer ("CO") would utilize a best-value trade-off methodology where non-price factors when combined were significantly more important than price.  *Id*.  The DOI would evaluate Factor 1 "in order to assess whether [the quoter's demonstrated prior experience] will lead to successful performance of the work required in the BPA PWS." *Id.*  For Factors 2 and 3, the DOI would evaluate whether the quoter's technical capability/understanding and management approach "will lead to successful performance of the work required in the BPA PWS and BPA Order 1 SOW."  AR 136; *see* AR 137.  At the conclusion of the evaluation stage, the DOI would award the three BPAs and BPA Order 1.  AR 135.

### B.    The Evaluation and Awards

The DOI received eight compliant quotes at the close of Phase I on April 23, 2021.  AR 615.  On May 19, 2021, the Technical Evaluation Committee ("TEC") completed the evaluation of Phase I submissions based on Factor 1, Demonstrated Prior Experience.  AR 320–59, 615.  The evaluation report provided an analysis for each quoter based on the five Factor 1 subfactors, and a summary of the quoter's risk to the Government and probability of successful performance.  AR 320–59.  Eagle, Dynanet, and two other quoters received the highest summary evaluation of "low risk to the Government with a high probability of successful performance."  AR 326; *see* AR 333, 336, 340.  The TEC performed a comparative analysis for Factor 1 and recommended that the four quoters with the highest summary evaluation proceed to Phase II.  AR 358.

On June 6, 2021, the four quoters submitted their Phase II responses.  AR 615.  The TEC completed the evaluation of Phase II on July 9, 2021.  *Id.*  The Phase II TEC report included the Factor 1 evaluations from Phase I.  AR 559–611.  For Factors 2 and 3, the TEC report identified "positive noteworthy observations" and "negative noteworthy observations" and concluded with an assessment of risk and probability of successful performance.  *Id.*

For Dynanet's Factor 2 evaluation, the TEC identified 18 positive noteworthy observations and zero negative noteworthy observations, concluding that Dynanet "presents a low risk to the Government with a high probability of successful performance."  AR 576; *see* AR 571–76.  For the same factor, the TEC identified four positive noteworthy observations and three negative noteworthy observations for Eagle, concluding that Eagle "presents a moderate risk to the Government with a moderate probability of successful performance."  AR 585; *see* AR 583–85.  For Dynanet's Factor 3 evaluation, the TEC identified four positive noteworthy observations and one negative noteworthy observation, concluding that Dynanet "presents a low risk to the Government with a high probability of successful performance."  AR 579; *see* AR 577–79.  Addressing Dynanet's negative noteworthy observation, the TEC noted that, "[a]lthough they do not have diverse skills within the personnel, they have clearly done the work before and they have shown that they have worked with similar stacks before."  AR 579.  For Factor 3, the TEC identified two positive noteworthy observations and zero negative noteworthy observations for Eagle, concluding that Eagle "presents a moderate risk to the Government with a moderate probability of successful performance."  AR 587; *see* AR 586–87.

The Phase II TEC report also contained a comparative analysis of Factors 2 and 3 for each of the four Phase II quoters.  AR 598–609.  The TEC found Dynanet to be the strongest quote in four of the six Factor 2 subfactors and tied with a third quoter (Easy Dynamics) on the other two

subfactors.  AR 598–605.  Of the five total subfactors under Factor 3, Dynanet had the strongest quote on the first subfactor; tied with Easy Dynamics as strongest quote on the second subfactor; and tied with both Eagle and Easy Dynamics as strongest quote on the third subfactor.  AR 605–08.  On the other hand, Eagle had the strongest quote on subfactor four, and Easy Dynamics had the strongest quote on the remaining subfactor.  AR 608–09.  Consequently, the TEC recommended that the three BPA awards go to Dynanet, Eagle, and Easy Dynamics.  AR 610.

For BPA Order 1, the TEC found Dynanet's quote superior to the quotes of Eagle and Easy Dynamics.  *Id*.  Among the three BPA awardees, Dynanet's price was between Eagle's price (the lowest of the three) and Easy Dynamic's price (the highest of the three).  *Id*.  Specifically, Dynanet's price was about five percent higher than Eagle's.  AR 637; *see* AR 955.  Because Dynanet's quote was superior but higher priced than Eagle's quote, the TEC conducted a trade-off analysis.  AR 610–11.  The TEC concluded that Dynanet's "higher price is considered justified by all the substantial technical benefits found in their quote and the TEC's increased confidence in successful performance."  AR 611.  The CO independently determined that the TEC's recommendations were correct.  AR 638.  On August 26, 2021, the DOI awarded the three BPAs to Eagle, Dynanet, and Easy Dynamics and awarded Dynanet with BPA Order 1.  AR 612–13, 639.

### C.    Procedural Background

#### 1.    Initial Post-Award Protest at the GAO

On September 7, 2021, Eagle filed a protest with the Government Accountability Office ("GAO"), arguing that the DOI failed to disqualify Dynanet based on an Organizational Conflict of Interest ("OCI").  AR 788–790.  Eagle further argued that the DOI's evaluation was incorrect and that its best-value analysis was at odds with the solicitation and lacked a reasonable basis.  AR

801–02.  On September 22, 2021, the GAO dismissed Eagle's evaluation challenge for failure to establish an adequate basis for protest.  AR 812.  The challenges based on best-value and OCI remained.  *Id*.  On October 4, 2021, the DOI informed the GAO that it would take corrective action by conducting a further OCI analysis and making a new best-value trade-off decision based on the existing evaluation record.  AR 814–15.  Over Eagle's objections, the GAO dismissed the protest as academic on October 8, 2021.  AR 822.

The CO then conducted an OCI investigation and concluded that Dynanet did not have an OCI that would prohibit it from receiving the award.  AR 955.  The CO also performed a new best-value determination using the existing evaluation record and concluded that Dynanet presented the highest technically evaluated quote with the lowest assessed risk and highest probability of successful performance.  *Id*.  Again noting the difference in price, the CO determined that the five percent price premium associated with Dynanet's quote was worth the higher probability of successful performance.  AR 955–56.  Accordingly, on March 7, 2022, the DOI notified Eagle that it again awarded BPA Order 1 to Dynanet.  AR 1011.

2.    Post-Corrective Action Protest at the GAO

On March 14, 2022, Eagle filed a second protest challenging the BPA Order 1 award.  AR 1013.  In addition to challenging the DOI's OCI decision, it alleged similar challenges to the DOI's evaluation of quotes and best-value decision as it raised in the initial protest.  AR 1025, 1031–32.  Regarding best-value, Eagle argued that the DOI's decision was flawed partly because Dynanet had far less experience with HHS/OIG/OIT than Eagle and its partner, DMI.  AR 1034.

In response, the DOI sought dismissal of the protest for failure to establish an adequate factual and legal basis.  AR 1120.  Addressing Eagle's argument about Dynanet's experience, the DOI explained that "[t]he BPA Order 1 factors fall under Technical Capability and Understanding

and Management Approach [Factors 2 and 3]—Prior Demonstrated Experience [Factor 1] is excluded." AR 1128. Eagle disagreed, arguing that the DOI misstated the solicitation when it erroneously claimed that Eagle's years of work with HHS/OIG/OIT could not have affected the Phase II technical evaluation. AR 1153–55.

On April 15, 2022, the GAO requested via minute entry that the DOI provide support for its contention that demonstrated prior experience was excluded from the BPA Order 1 evaluation. AR 1375. The DOI responded the same day by submitting two pages from Section 7, Evaluation, of the original RFQ, arguing that "[n]o [task] order evaluation considerations fall under the Demonstrated Prior Experience factor." AR 1375; *see* AR 1369–70. Eagle requested permission to reply to the DOI's purported misreading of the solicitation, claiming that the solicitation required the DOI to evaluate Factor 1, Demonstrated Prior Experience, in awarding BPA Order 1. AR 1182–88, 1375. On April 18, 2022, Eagle filed a request for summary decision reiterating the Factor 1 arguments stated in its request for leave to file a reply. AR 1190–94.

On April 19, 2022, the GAO notified the parties of its intent to dismiss the OCI and evaluation challenges for failure to state a valid basis for protest. AR 1195. The GAO directed the DOI to prepare an Agency report on the remaining best-value grounds. *Id*. A week later, the DOI filed an Agency report restating its reading of the BPA Order 1 evaluation factors. AR 1211–14. It argued that, per the plain language of Section 7, the DOI would evaluate Factor 1 to assess a quoter's likelihood of successful performance of the BPA PWS, while Factors 2 and 3 were intended to assess performance of the BPA PWS and the BPA Order 1 SOW. AR 1212. In its comments to the Agency report, Eagle argued that the DOI's interpretation was unreasonable and contrary to the solicitation. AR 1299. In the alternative, Eagle claimed the solicitation contained a latent ambiguity regarding the factors that would be considered in the best-value trade-off

analysis.  AR 1309–10.  Eagle also added a supplemental protest ground, claiming that the DOI evaluated quoters in an unequal manner.  AR 1312.  Specifically, Eagle argued that the DOI disregarded Eagle's demonstrated prior experience but considered the same for Dynanet in mitigating a risk identified in its Phase II submission.  AR 1314.  The DOI responded with a declaration from the TEC Chairperson to clarify that the DOI did not use Dynanet's organizational experience, but rather the experience of the proposed key personnel, in assessing Dynanet's Management Approach under Factor 3.  AR 1339–40; *see* AR 1341.

On June 22, 2022, the GAO issued a final decision.  AR 1358.  As relevant here, the GAO found the DOI's explanation of the ambiguous reference to prior work in Dynanet's Phase II evaluation reasonable.  AR 1364–65.  Because Eagle did not show that the DOI considered Dynanet's demonstrated prior experience in awarding BPA Order 1, it failed to establish that the DOI treated Eagle and Dynanet disparately.  AR 1365.  Regarding Eagle's best-value arguments, the GAO found that the solicitation did not "preclude the possibility that prior experience was to be considered for the task award order."  AR 1367.  According to the GAO, the language in the RFQ advising quoters that Factor 1 "'will be considered[]' together with the phase [II] factors" could reasonably be interpreted as including prior experience in the task order evaluation.  *Id.*  The GAO concluded that, because the solicitation language was inconsistent in how the DOI would consider the various factors for BPA Order 1, the ambiguity was patent; therefore, Eagle should have presented its challenge prior to the solicitation's closing date.  *Id*.  And even if it were to conclude that the ambiguity was latent, the GAO held that Eagle failed to timely file the challenge.  *Id*.  Consequently, the GAO found the best-value challenge to be without merit, and it denied in part and dismissed in part Eagle's post-corrective action protest.  AR 1368.

> 3.    The Present Protest

On July 1, 2022, Eagle filed its two-count complaint in this Court.  *See* Pl.'s Compl., ECF No. 1.  The Complaint alleges that the DOI failed to follow the terms for the RFQ by not considering Eagle's prior experience (Factor 1) in its evaluation for the BPA Order 1 award, and that the DOI afforded Dynanet disparate and preferential treatment by favorably considering Dynanet's prior experience in awarding it with the task order.  *Id.* ¶¶ 40, 45.  On August 22, 2022, Eagle filed a Motion for Judgment on the Administrative Record.  *See* Pl.'s Mot. for J. on Admin. R., ECF No. 24-1.  On September 21, 2022, the Government and Dynanet filed Cross-Motions for Judgment on the Administrative Record.  *See* Gov't.'s Cross-Mot. for J. on Admin. R., ECF No. 26; Def.-Intervenor's Cross-Mot. for J. on Admin. R., ECF No. 25-1.  The parties' arguments largely mirror those raised in the second GAO protest.  The motions are now fully briefed.  *See* Pl.'s Reply, ECF No. 28; Gov't.'s Reply, ECF No. 29; Def.-Intervenor's Reply, ECF No. 30.  The Court held oral argument on October 21, 2022.

During the oral argument, Eagle's counsel informed the Court that Eagle intended to move for leave to amend the Complaint.  *See* Oral Arg. Tr. at 45:15–45:21, ECF No. 35.  Eagle filed such motion on October 24, 2022.  *See* Pl.'s Mot. for Leave to File an Am. Compl., ECF No. 31. In its motion, Eagle argues that Dynanet's mapping of labor categories did not meet the RFQ requirements and that Dynanet's mis-mapping affects the remedies in this case.  *Id.* at 5, 15, 23. On November 4, 2022, the Government and Dynanet filed responses, arguing (among other things) that Eagle unduly delayed its filing and that its proposed amendment would be futile.  *See* Gov't.'s Resp. to Pl.'s Mot. for Leave to File an Am. Compl. at 8, 10, ECF No. 32; Def.-Intervenor's Resp. to Pl.'s Mot. for Leave to File an Am. Compl. at 2, 3, ECF No. 33.  Plaintiff's motion is now fully briefed and ripe for decision.  *See* Pl.'s Reply, ECF No. 38.

## II.  LEGAL STANDARDS

### A.    Motions for Leave to File an Amended Complaint

Rule 15(a)(2) of the Rules of United States Court of Federal Claims ("RCFC") provides that a party may amend its complaint outside the 21-day period "with the opposing party's written consent or the court's leave," which "[t]he court should freely give when justice so requires."  The decision to grant or deny leave to amend is "within the discretion of the trial court."  *Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1403 (Fed. Cir. 1989).  Factors that may justify denial of a motion for leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1158 (Fed. Cir. 2014) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  "The existence of any one of these criteria is sufficient to deny a motion to amend, the theory being that the amendment would not be necessary to serve the interests of justice under such circumstances."  *Christofferson v. United States*, 77 Fed. Cl. 361, 363 (2007) (quoting *Spalding & Son, Inc. v. United States*, 22 Cl. Ct. 678, 680 (1991)).

### B.    Motions for Judgment on the Administrative Record

RCFC 52.1(c) governs motions for judgment on the administrative record.  Such motions are "properly understood as . . . an expedited trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the

11

burden of proof to show that the [challenged action or] decision was not in accordance with the law." *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357). Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record. *See Bannum*, 404 F.3d at 1357.

### C.    Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ." 28 U.S.C. § 1491(b)(1).  In such actions, the Court "review[s] the agency's decision pursuant to the standards set forth in section 706" of the Administrative Procedure Act.  28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).   Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).  Under such review, an "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332.  To prevail in a bid protest, "a protestor must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).   A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error."  *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

In reviewing an agency's procurement decisions, the Court does not substitute its judgment for that of the agency. *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations."). The disappointed bidder "bears a heavy burden," and the CO is "entitled to exercise discretion upon a broad range of issues . . . ." *Impresa*, 238 F.3d at 1332–33 (citations and quotes omitted). This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983). A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333. "[T]hat explanation need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

In a protest, the Court applies de novo review to any questions of law. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). The interpretation of a solicitation or of procurement regulations present such questions. *See id.*; *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed. Cir. 1986). Regardless of whether the decision on review is that of the contracting officer or of the GAO, the Court of Federal Claims does not afford deference on questions of law. *See VS2, LLC v. United States*, 155 Fed. Cl. 738, 767 (2021); *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 340 (2012) (holding that the degree of deference applied under the arbitrary-and-capricious standard does not change depending on whether the court is reviewing the agency-level decision or the GAO's decision in a subsequent protest, and "[n]o 'special' amount of deference, covering questions of law as well as the ultimate decision

being reviewed, can be gleaned from the . . . Federal Circuit precedents . . . .")); *see also E.W. Bliss Co. v. United States*, 33 Fed. Cl. 123, 135 (1995), *aff'd*, 77 F.3d 445 (Fed. Cir. 1996).  Nor is the Court bound by GAO decisions, although such decisions are nonetheless considered "instructive" in the context of bid protests.  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009).

## III.  DISCUSSION

Eagle fails to meet its burden on either of the asserted grounds of its protest.  First, the Court finds that the plain language of the RFQ did not require the DOI to consider Factor 1 in awarding the task order.  The RFQ stated that Factor 1 would be evaluated to assess the successful performance of only the work required in the BPA PWS—as distinct from Factors 2 and 3, which would be evaluated to assess both the work required in the BPA PWS and the BPA Order 1 SOW. Second, the Court finds that Eagle does not state a valid disparate evaluation challenge against the DOI.  The Government's explanation for what experience was considered under Factor 3 is rational and supported by the administrative record, and it demonstrates that the DOI did not treat the parties unequally.  Because Eagle does not meet its burden of proving that the DOI acted arbitrarily and capriciously in awarding the task order, Eagle is not entitled to judgment on the administrative record.

### A.   Eagle's Motion for Leave to File an Amended Complaint Is Unduly Delayed, And the Proposed Amendment Would Be Futile.

As a preliminary matter, the Court must resolve Eagle's post-argument request to amend the Complaint.  In its motion for leave, Eagle argues that Dynanet mis-mapped the labor categories in its quote by proposing workers without the skills or qualifications required by the Government. ECF No. 31 at 5.  Eagle contends that the alleged deficiency was not apparent earlier because Dynanet's GSA MAS contract was not included in the administrative record, and Eagle was only

able to locate and assess the contract posted on the GSA website by tracing a reference to it in Dynanet's proposal. *Id.* at 5 n.1. According to Eagle, Dynanet's mis-mapping shows that it posed a higher performance risk than Eagle and artificially lowered Dynanet's price. *Id.* at 21–22.

The Government and Dynanet argue that Eagle unduly delayed filing its proposed amended complaint, which it could have filed once the administrative record was filed on July 15, 2022. ECF No. 32 at 8–10; ECF No. 33 at 2–3. They further argue that Eagle's proposed amendment would be futile because Dynanet's mapping (and the DOI's price evaluation based in part on that mapping) was consistent with the requirements of the RFQ and because Eagle's quote showed it interpreted the RFQ's mapping requirements in the same manner as Dynanet. ECF No. 32 at 10, 24–25; ECF No. 33 at 3–4.

The Court agrees with the Government and Dynanet. First, Eagle's motion is unduly delayed, having been filed over three months after Eagle filed suit and the Government filed the administrative record, two months after Eagle moved for judgment on the administrative record, and days after the Court heard oral argument on the parties' cross-motions. Because the bid protest process is "designed to resolve disputes as quickly as possible, even relatively short delays may be unreasonable." *Sonoran Tech. and Pro. Servs., LLC v. United States*, 133 Fed. Cl. 401, 404 (2017). Indeed, in *Sonoran*, the court denied a motion to amend that was filed only six weeks after the protest was initiated and before dispositive briefing was complete. *Id.*

Nor has Eagle justified its delay in seeking to amend its complaint. *See id.* ("The 'party seeking to amend its complaint after significant delays bears the burden of justifying the delay.'" (quoting *Cupey Bajo Nursing Home, Inc. v. United States*, 36 Fed. Cl. 122, 132 (1996)); *Te-Moak Bands of W. Shoshone Indians of Nev. v. United States*, 948 F.2d 1258, 1263 (Fed. Cir. 1991) (holding that with the passage of time "a point is reached when the party seeking to amend must

15

justify that request by more than invocation of the concept of the rule's liberality").  Eagle explains that the reason for the delay is that Dynanet's GSA MAS contract was not included in the administrative record.  ECF No. 31 at 5 n.1; ECF No. 38 at 8.  However, that fact should have been known to Eagle in July 2022 when the Government lodged the record in this case.  At that point, Eagle could have requested that the administrative record be completed or supplemented with Dynanet's GSA MAS.  Or, Eagle could have argued that its absence from the record demonstrated a deficiency in Dynanet's quote or in the DOI's evaluation.  Or, since the contract is publicly available, Eagle could have traced the reference in the administrative record to the GSA website to discover the information that underlies the allegations it now seeks to assert.  Eagle's motion simply does not explain why it did not conduct that due diligence (or pursue a different avenue to raise the issue) at an earlier stage of the case.

Additionally, Eagle's proposed amendment would be futile because it would not survive a dispositive motion.  *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1355 (Fed. Cir. 2006).  Specifically, Eagle has failed to show that Dynanet did not follow the solicitation requirements for mapping labor categories.  The RFQ required quoters to identify their proposed labor categories based on their GSA schedules and "map back [the labor categories] to the BPA job descriptions and minimum qualifications" stated in the relevant attachment to the RFQ.  AR 134.  It further stated that "[f]or each labor category, ensure that there is a one-to-one correlation between the labor category names provided in the RFQ and the GSA labor category names provided within the quote."  *Id.*  The RFQ, however, did not require that the proposed labor categories in the GSA schedule have at least the same minimum characteristics as the RFQ labor categories in order to be properly correlated.  Indeed, case law demonstrates that when evaluating the sufficiency of labor category mapping, differences in job titles or qualifications are not

dispositive.  Rather, the standard requires that the GSA schedule labor categories need only be "consistent with the function" of the RFQ labor categories.  *See HomeSource Real Est. Servs., Inc. v. United States*, 94 Fed. Cl. 466, 486 (2010) ("The government need only determine that the function of the job category listed in the Solicitation is sufficiently close to the service offered in the vendor's FSS contract."); *Data Mgmt. Servs. Joint Venture v. United States*, 78 Fed. Cl. 366, 377 (2007) ("[A]lthough plaintiff is correct in pointing out that the stated function of ALON's Senior Requirements Analyst does not specifically mention the task of risk management, it is certainly plausible that a requirements analyst would be in a position to manage the risks related to the development of the ERA program.").

Moreover, the RFQ did not require the DOI to assess how closely each quoter's proposed labor categories correlated to the RFQ's labor categories based on qualifications and experience. The RFQ's mapping requirement pertained to the Phase II Volume III submission, focused solely on price, which was separate from the technical considerations (such as proposed staffing) addressed in Phase II Volume II.  Pursuant to the RFQ, the price evaluation was based on "accuracy, completeness, discounts offered, and reasonableness."  AR 137.  This make sense, as "mapping is primarily a devise for assigning maximum prices."  *Data Mgmt. Servs.*, 78 Fed. Cl. at 379.  As such, "there is a great deal of self-certification in the 'mapping' process."  *Id.*  Indeed, the thrust of Eagle's new claim—that Dynanet's labor category mapping proposed to use personnel without the requisite experience and expertise—is simply incorrect.  *See* ECF No. 31 at 19. Because the procurement was accomplished by way of an RFQ, Dynanet's proposal was an acceptance of the Government's offer and a commitment to perform using personnel who meet the requirements of the RFQ's labor categories.  Whether Dynanet ultimately provides the required staffing would be a matter of contract administration.  *See Data Mgmt. Servs.*, 78 Fed. Cl. at 379.

Accordingly, Eagle's motion for leave to file an amended complaint is denied because it is unduly delayed and the proposed amendment would be futile.

**B.      The DOI Was Not Required to Consider Factor 1 in Awarding BPA Order 1.**

Turning to the claims pled in the Complaint, Eagle argues that the DOI did not evaluate proposals in a manner consistent with the RFQ's evaluation criteria.  ECF No. 24-1 at 32–36.  Specifically, Eagle contends that the DOI misread the RFQ by not considering Factor 1, Demonstrated Prior Experience, in awarding BPA Order 1.  *Id*. at 32.  According to Eagle, the DOI's interpretation rested entirely on the fact that the RFQ did not state any order evaluation considerations under Factor 1, in contrast to Factors 2 and 3 which expressly referred to certain considerations "For BPA Order 1."  *Id*. at 18, 34.  Eagle alleges that this reading ignores the addendum on page five of the RFQ, stating that "Phase I / Factor 1, the most important factor, will be considered alongside the evaluation of Phase II when the Government makes its source selection decision."  *Id*. at 34.  Eagle asserts that nothing in the RFQ expressly stated that Phase I was irrelevant to the award of BPA Order 1.  *Id*.

The Government and Dynanet disagree, arguing that the RFQ did not require the DOI to consider Factor 1 in awarding BPA Order 1.  ECF No. 26 at 28–34; ECF No. 25-1 at 17–19.  The Government contends that the analysis begins and ends with Section 7 of the RFQ, which identified the evaluation factors.  ECF No. 26 at 30.  The Government highlights that the language in Section 7 notified quoters that Factor 2, Technical Capability and Understanding, and Factor 3, Management Approach, together with Price, would be evaluated for BPA Order 1.  *Id*. at 32.  The Government contends that, contrary to Eagle's arguments, the DOI's interpretation is appropriately based on the express language in Section 7, and not merely "silence" regarding Factor 1.  *Id*. at 32–33.

Eagle's first claim involves the interpretation of the terms of the RFQ, and as such presents a question of law. *Banknote Corp. of Am.*, 365 F.3d at 1353.  The principles governing contract interpretation apply with equal force where the Court is tasked with interpreting a solicitation. *Id*. at 1353 n.4 (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997–98 (Fed Cir. 1996)). Thus, the Court must begin with the text of the RFQ. *Id.* at 1353; *see Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citing *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993)).  If the RFQ's "provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (quoting *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993)).  If the Court finds that "specific and general terms in [the RFQ] are in conflict, those which relate to a particular matter control over the more general language." *Info. Scis. Corp. v. United States*, 80 Fed. Cl. 759, 792 (2008) (quoting *Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (Fed. Cir. 1992)).  Ultimately, the Court is guided by the principle that an "interpretation that gives meaning to all parts of the [solicitation] is to be preferred over one that leaves a portion of the [solicitation] useless, inexplicable, void, or superfluous." *NVT Techs.*, 370 F.3d at 1159.

In this case, the plain language of the RFQ did not require the DOI to consider Factor 1 in awarding BPA Order 1.  A quoter need only turn to Section 7 of the RFQ, titled "Evaluation," to determine how the DOI intended to assess each evaluation factor and for what purpose.  AR 135–37.  The relevant language is excerpted below.

### Volume I, Section 6: Factor 1 – Demonstrated Prior Experience (Phase I)

The Government will evaluate the Quoter's Demonstrated Prior Experience in order to assess whether it will lead to successful performance of the work required in the BPA PWS . . . .

**Volume II, Section 3: Factor 2 – Technical Capability and Understanding (Phase II)**

The Government will evaluate the Quoter's Technical Capability and Understanding in order to assess whether it will lead to successful performance of the work required in the BPA PWS and *BPA Order 1 SOW . . . .*

**Volume II, Section 3: Factor 3 – Management Approach (Phase II)**

The Government will evaluate the Quoter's Management Approach in order to assess whether it will lead to successful performance of the work required in the BPA PWS and *BPA Order 1 SOW . . . .*

AR 135–37 (emphasis added). Thus, according to the RFQ, a quoter's prior experience (Factor 1) would be assessed to determine whether the quoter could successfully perform the work required in the BPA PWS, whereas a quoter's technical capability and understanding (Factor 2) and management approach (Factor 3) would be assessed with respect to not only the work required in the BPA PWS but also the BPA Order 1 SOW. Additionally, certain subfactors of Factors 2 and 3 expressly denoted criteria to be evaluated "**For BPA Order 1**." AR 136, 137. Similar task order-specific criteria were noticeably absent in Factor 1. AR 135–36. That the RFQ expressly distinguished the purpose of the evaluation of Factor 1 (*i.e.*, awarding the BPAs) from the purpose of the evaluation of Factors 2 and 3 (*i.e.*, awarding the BPAs and BPA Order 1) is, in the Court's opinion, dispositive of the issue. In short, to give effect to the plain language of Section 7—so that no part of the RFQ is rendered "useless, inexplicable, void, or superfluous," *NVT Techs.*, 370 F.3d at 1159—the Court must recognize those differences. *Cf. AM General, LLC v. United States*, 115 Fed. Cl. 653, 671 (2014) (applying negative implication cannon to interpret solicitation in bid protest).

Eagle's attempts to demonstrate a reasonable alternative interpretation are unpersuasive. First, Eagle argues that the Government's interpretation ignores other language in the RFQ that purportedly advised quoters that the DOI would consider prior experience in making the final

20

award decision and, indeed, it would be the most important evaluation factor.  ECF No. 24-1 at

11.  Specifically, Eagle quotes the addendum on page five of the RFQ, which stated that Phase I /

Factor 1 "will be considered alongside the evaluation of Phase II when the Government makes its

source selection decision."  *Id.* (quoting AR 131).  But considering one factor "alongside" of—

*i.e.*, contemporaneous with—the evaluation of other factors did not mean that the DOI would apply

the same criteria to all factors or assess all factors for the same purpose.  Nor can the quoted

statement from the addendum be read in isolation.  *NVT Techs.*, 370 F.3d at 1159 (citing *McAbee*

*Constr., Inc. v. United States*, 97 F.3d 1431, 1434–35 (Fed. Cir.1996) (holding that proper

interpretation requires reading the solicitation as a whole to harmonize and give meaning to all its

parts).  Indeed, when viewed in the context of the RFQ in its entirety, the addendum is consistent

with the DOI's plan to conduct the evaluation for the award of the BPAs and BPA Order 1 at the

same time.  AR 127 ("BPA Order 1 will be competed and evaluated concurrently with the multiple

award BPAs.").  It is likewise consistent with the RFQ's ranking of evaluation factors, which listed

prior experience as the most important factor.  AR 135.  Indeed, in Phase I, prior experience was

the only factor and, absent a positive evaluation on that factor, quoters would be advised that they

were unlikely to be viable competitors.  AR 131.  And even if the general statement relied on by

Eagle, which was included as a note at the end of the RFQ's description of the Phase I submission

content, could be construed as conflicting with the evaluation criteria set forth in Section 7, the

specific provisions in the latter section describing how the DOI would conduct its evaluation are

controlling.[2]  *See Info. Scis. Corp.*, 80 Fed. Cl. at 792.

---

[2]  The GAO gave more credence to Eagle's interpretation, finding the RFQ to be "inconsistent in its explanation of how the agency would consider the various factors for award of the task order."  AR 1367.  For the reasons explained above, the Court respectfully disagrees.  And because the issue raises a question of law, the Court is not bound by and does not owe deference to the GAO's holding.  *See VS2*, 155 Fed. Cl. at 767.

Eagle also relies on various items of extrinsic evidence to support its contention that the DOI advised quoters that demonstrated prior experience would be considered in awarding BPA Order 1.  *See* ECF No. 24-1 at 21–29.  Eagle, however, cannot create an ambiguity through extrinsic evidence where none exists in the plain language of the RFQ.  *See Shell Oil Co. v. United States*, 751 F.3d 1282, 1295 (Fed. Cir. 2014).  Nor has it demonstrated that any of the extra-record documents it cites were incorporated by reference into the RFQ.  *See Northrop Grumman Info. Tech. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008).

Finally, Eagle argues that one reference to the BPA PWS in the five subfactors to be considered under Factor 1 should not drive the interpretation of the RFQ as a whole.  ECF No. 24-1 at 37–38.  According to Eagle, the work described under Factor 1 fell within the scope of work to be performed under BPA Order 1, and thus the RFQ "built an obvious bridge" between Factor 1 and BPA Order 1.  *Id.* at 39; *see id.* at 37–38; *see also* ECF No. 28 at 11 (arguing that "the task order 'nests' within the BPA").  This contention fails for two reasons.  First, it ignores that the first sentence of each evaluation factor sets forth what the DOI would assess based on the entire factor, as opposed to language in a particular subject area or subfactor.  Second, that Eagle believes it would have been rational to evaluate prior experience in awarding BPA Order 1 is immaterial. The Court's task is only to interpret the RFQ to determine what the DOI advised quoters it would do.  Based on the plain language, the Court concludes that the RFQ did not require the DOI to evaluate Factor 1 in assessing a quoter's successful performance of the BPA Order 1 SOW.  On that point, there is no ambiguity.

Even if there were an ambiguity, however, it would be a patent ambiguity that Eagle was required to raise prior to award.  Whether a solicitation provision was ambiguous is a question of law for the Court, as is the question of whether an ambiguity was patent or latent.  *NVT Techs.*,

370 F.3d at 1159.  A patent ambiguity is present where there are facially inconsistent provisions that would "place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016) (quoting *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000)).  A latent ambiguity is hidden or concealed, not apparent on the face of the document, could not be discovered by "reasonable and customary care and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification." *Id*. (quoting *Analytical & Rsch. Tech., Inc. v. United States*, 39 Fed. Cl. 34, 46 (1997)).  "[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

Here, assuming the parties' interpretations of the RFQ are both reasonable such that a true ambiguity exists, it was not hidden or concealed.  If, as Eagle argues, the addendum on page five of the RFQ could reasonably be construed as advising quoters that all four factors would be considered in awarding both the BPAs and BPA Order 1, then the evaluation criteria set forth in Section 7 contained an obvious inconsistency in its description of the Factor 1 evaluation criteria. Namely, the very first sentence describing the Factor 1 evaluation referred only to the BPA PWS, in noticeable contradiction to the first sentences of the Factors 2 and 3 evaluations.  One would expect that a quoter who similarly interpreted the statement on page five would, as a matter of reasonable and customary care, read the evaluation criteria in Section 7 and inquire why, unlike the other factors, the DOI did not plan to evaluate Factor 1 in relation to the BPA Order 1 SOW.

Eagle contends that a patent ambiguity cannot be predicated on the mere "silence" in Section 7, as it is "not an express statement that would be 'glaring' or 'obvious.'"  ECF No. 24-1 at 37.  The precedent does not support Eagle's characterization of the standard.  That a reference to the BPA Order 1 SOW was omitted from Factor 1, despite being expressly included in Factors 2 and 3, was glaring and obvious.  If it was in fact a defect in the terms of the RFQ, it would be best described as "an omission, inconsistency, or discrepancy" and, in any case, was a patent ambiguity.  *Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020).  Because Eagle did not seek clarification about the DOI's use of the Factor 1 evaluation prior to the close of the bidding process, Eagle has waived its right to raise an objection now.

Accordingly, Eagle has failed to demonstrate that the DOI's interpretation of the RFQ was arbitrary and capricious.[3]

### C.      Eagle Does Not State a Valid Disparate Evaluation Challenge.

Eagle also argues that the DOI treated Dynanet and Eagle unequally by considering Factor 1 for Dynanet, but not for Eagle, in awarding BPA Order 1.  ECF No. 24-1 at 35–36.  As proof of disparate treatment, Eagle points to a statement in the Phase II TEC report, which noted that "[o]ut of all three technical factors" the only factor presenting some risk for Dynanet was a lack of diverse experience in personnel.  *Id.* at 26 (quoting AR 610) (emphasis omitted).  The TEC found this risk "was mitigated because Dynanet was able to demonstrate through other areas of their quote that they have done this type of work before."  *Id.* (emphasis omitted).  Eagle argues that the "they" in this statement shows "the TEC was actually looking to Dynanet's prior experience."  *Id.* at 28 (emphasis omitted); *see id*. at 43.  According to Eagle, the unequal treatment harmed Eagle because, had it also considered Eagle's prior experience for purposes of awarding BPA Order 1,

---

[3] In light of the Court's ruling, it is not necessary to address Eagle's arguments that it was prejudiced by the DOI's interpretation.

the DOI would have recognized that Eagle did not suffer from the same lack of experience as Dynanet. *Id*. at 35–36.

In response, the Government and Dynanet argue that the DOI did not treat the parties unequally. ECF No. 26 at 51–55; ECF No. 25-1 at 20–22. The Government explains that the prior experience considered for Dynanet in awarding BPA Order 1 was that of Dynanet's key personnel, as part of Factor 3's criteria, and not of Dynanet as an organization, per Factor 1. ECF No. 26 at 54. In particular, the Government notes that the experience referred to was based on the resumes of Dynanet's key personnel, which were included in Dynanet's quote. *Id*. And, as explained in the declaration of the TEC Chairperson submitted in the GAO protest, the pronoun "they" was not identifying Dynanet as an organization but referred to Dynanet's key personnel. *Id*.

To prevail on a claim of disparate evaluation, a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were "substantively indistinguishable" from or "nearly identical" to those contained in other proposals. *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citing *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017)); *Red River Comput. Co. v. United States*, 120 Fed. Cl. 227, 238 (2015). A protestor also may prevail by showing the agency inconsistently applied objective solicitation requirements among it and the other offerors. *Sci. Applications Int'l Corp. v. United States*, 108 Fed. Cl. 235, 272 (2012) (citing *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 691 (2012)). If a protestor does not meet this threshold showing, then the court should dismiss the claim, otherwise it "would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings." *Office Design Grp.*, 951 F.3d at 1373.

Here, Eagle has not demonstrated that the DOI considered Factor 1 for Dynanet in awarding BPA Order 1. Eagle's claim revolves around two sentences in the Phase II TEC report

and subsequent award summary discussing the risk "related to the lack of diverse experience reflected in the submitted resumes." AR 610; *see* AR 636–37. But that experience directly refers to Subfactor 5 of Factor 3, Management Approach, which addressed the degree to which a quoter's proposed staffing (both quantity and skill mix) aligns with its technical approach. AR 578–79; *see* AR 608–09. Dynanet's negative noteworthy observation for this subfactor referred to its "key personnel's experience," AR 579, not the prior experience of the organization evaluated under Factor 1.

Nor does the pronoun "they" in the following sentence show that the TEC used prior organizational experience to mitigate the risk posed by Dynanet's proposed staffing. The TEC report's summary of that subfactor stated, "Although they do not have diverse skills within the personnel, they have clearly done the work before and they have shown that they have worked with similar stacks before." *Id*. The TEC's recommendation included a clearer version of this statement. It stated, "Dynanet was able to demonstrate through other areas of their quote that they have done this type of work before." AR 610; *see* AR 637. The TEC Chairperson explained, in a declaration signed under penalty of perjury, that the TEC's comments were addressed to the experience of the individuals Dynanet proposed as key personnel. AR 1341–42. The Chairperson asserted that Dynanet's negative noteworthy observation was mitigated because the key "personnel demonstrated an acceptable skillset with regard to legacy applications . . . ." AR 1342. The resumes of Dynanet's key personnel, submitted as part of Dynanet's quote, support this explanation. AR 399–406 (describing experience including "[. . .]," "[. . .]," and "[. . .].").

Contrary to Eagle's arguments, that the sentences at issue in the TEC report (and subsequent award summary) also included the phrase "all three technical factors" does not conflict with the DOI's explanation. AR 610 ("Out of all three technical factors, the only element of

Dynanet's quote that introduced some risk was related to the lack of diverse experience reflected in the submitted resumes."); *see* AR 636–37.  This statement does not alone indicate that the DOI considered Factor 1 in awarding the task order, and Eagle has pointed to nothing else in the TEC report or award summary from which the Court could reasonably infer otherwise.  Rather, the reference indicates exactly what it says: Dynanet had only one negative noteworthy observation for any technical evaluation factor, which is supported by the administrative record.  As for the task order, the award summary succinctly explained why Dynanet beat out the other BPA awardees to receive BPA Order 1: it "provided the strongest technically-evaluated quote with the lowest assessed risk and highest probability of successful performance."[4]  AR 636; *see* AR 610.

Because Eagle has failed to show that the DOI inconsistently considered Factor 1 in awarding the task order, Eagle cannot prevail on its disparate evaluation claim.

### D.    No Injunctive Relief Is Warranted Because Eagle Fails on the Merits.

A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case;" (2) it "will suffer irreparable harm if the court withholds injunctive relief;" (3) "the balance of hardships to the respective parties favors the grant of injunctive relief;" and (4) "it is in the public interest to grant injunctive relief."  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).  Because Eagle has not succeeded on the merits of its protest, no injunctive relief is warranted in this case.  *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373,

---

[4] The decision went on to note that Dynanet's quote was comparatively stronger than the other quotes on Factor 2, "which was the most important factor in Phase [II]."  AR 636.  Contrary to Eagle's argument, this statement is not at odds with the RFQ.  *See* ECF No. 24-1 at 22.  Indeed, consistent with the Court's analysis above, the quoted statement is accurate as it relates to BPA Order 1 specifically because the RFQ did not contemplate Factor 1 being considered for the task order award.  *See* AR 135 (listing evaluation factors in descending order of importance and by evaluation phase); AR 135–37 (identifying the evaluation criteria and the purpose for evaluating each factor).

1384 n.7 (Fed. Cir. 2022); *ANHAM FZCO v. United States*, 149 Fed. Cl. 427, 439 (2020) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018)).

## IV. CONCLUSION

For the reasons set forth above, Eagle's Motion for Leave to File an Amended Complaint (ECF No. 31) is **DENIED**, Eagle's Motion for Judgment on the Administrative Record (ECF No. 24) is **DENIED**, the Government's Cross-Motion (ECF No. 26) is **GRANTED**, and Dynanet's Cross-Motion (ECF No. 25) is **GRANTED**.  The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after January 12, 2023, unless the parties submit **by no later than January 9, 2023**, an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED.**

Dated: December 29, 2022                                     */s/ Kathryn C. Davis*

                                                                                          KATHRYN C. DAVIS
                                                                                          Judge